In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 18-1277 & 18-1280

ANNIE LAURIE GAYLOR, *et al.*,

*Plaintiffs-Appellees,*

*v.*

STEVEN T. MNUCHIN, *et al.*,

*Defendants-Appellants,*

and

EDWARD PEECHER, *et al.*,

*Intervening
Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Western District of Wisconsin.
No. 16-cv-215 — **Barbara B. Crabb**, *Judge.*

———————————

ARGUED OCTOBER 24, 2018 — DECIDED MARCH 15, 2019

———————————

Before BAUER, MANION, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Since the Founders crafted the Religion Clauses of the First Amendment, courts have grappled

with the "play in the joints" between them. *Walz v. Tax Comm. of City of N.Y.*, 397 U.S. 664, 669 (1970). This case calls us to do so once more. Freedom From Religion Foundation ("FFRF") claims that a longstanding tax code exemption for religious housing, 26 U.S.C. § 107(2) of the Internal Revenue Code, violates the Establishment Clause. The district court agreed. The U.S. Treasury Department and several intervening religious organizations ask us to reinstate the exemption, asserting that the survival of many congregations hangs in the balance. We must decide whether excluding housing allowances from ministers' taxable income is a law "respecting an establishment of religion" in violation of the First Amendment.

## I.

### A.  History of § 107(2)

The facts before us are not in dispute. The Sixteenth Amendment was ratified in 1913, authorizing Congress to levy an income tax. Congress imposed a federal income tax that same year and has levied one in various forms since. As a result, Congress and the Treasury Department needed to define taxable "income." A rule defining income that survives today in the Internal Revenue Code is the "convenience-of-the-employer" doctrine. Under that doctrine, housing provided to employees for the convenience of their employer is exempt from taxable income. Early examples of exclusions under the doctrine include housing provided to sailors living aboard ships, workers living in camps, and hospital employees. But the convenience-of-the-employer doctrine was not

made available to ministers.[1] In 1921, the Treasury Department announced ministers would be taxed on the fair rental value of parsonages provided as living quarters. O.D. 862, 4 C.B. 85 (1921).

Congress reacted quickly and enacted a statute to exclude church-provided parsonages from the taxable income of ministers. The Treasury Department interpreted this statute to apply only to housing provided in-kind; cash housing allowances were included in income. I.T. 1694, C.B. II-1, at 79 (1923). This continued for decades until in the 1950s several ministers successfully challenged the limitation to in-kind housing.[2] Congress then enacted 26 U.S.C. § 107, which provides:

> In the case of a minister of the gospel, gross income does not include—
>
> (1) the rental value of a home furnished to him as part of his compensation; or
>
> (2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home …

---

[1] The text of the tax code refers specifically to "ministers of the gospel," so we use that term. Courts have long held the provision applies to religious leaders of any denomination, regardless of formal title. *See, e.g.,* *Salkov v. Comm'r*, 46 T.C. 190, 194 (1966) (holding a Jewish cantor was a "minister of the gospel").

[2] *See, e.g.,* *Williamson v. Comm'r*, 224 F.2d 377 (8th Cir. 1955); *Conning v. Busey*, 127 F. Supp. 958 (S.D. Ohio 1954); *MacColl v. United States*, 91 F. Supp. 721 (N.D. Ill. 1950).

Section 107(1) reauthorized the in-kind parsonage exemption in place since the 1920s. Section 107(2) authorized the IRS to also exempt cash allowances from ministers' taxable income.[3]

## B. District Court Proceedings

FFRF describes itself as a "nonprophet nonprofit" organization that "[t]akes legal action challenging entanglement of religion and government, government endorsement or promotion of religion." *What Does the Foundation Do?*, FREEDOM FROM RELIGION FOUNDATION, https://ffrf.org/faq/item/15001-what-does-the-foundation-do (last visited March 10, 2019). Seeking to challenge both § 107(1) and § 107(2), FFRF paid its co-presidents Annie Gaylor and Dan Barker a portion of their salaries in the form of a housing allowance. FFRF also paid this housing allowance to a former president of the organization, Anne Nicol Gaylor ("Nicol Gaylor").[4] FFRF, Gaylor, Barker, and Nicol Gaylor, none of whom meet the IRS's definition of "minister," then sued the Treasury Department, claiming § 107 violates the First Amendment because it conditions a tax benefit on religious affiliation. We dismissed this challenge for lack of standing because FFRF and its employees never applied for § 107(1) or § 107(2) exemptions, so they were

---

[3] An amicus brief from the University of St. Thomas School of Law (Minnesota) estimates that of the United States' 384,000 congregations, 200,000 to 300,000 provide a housing allowance to their ministers under 26 U.S.C. § 107(2).

[4] Nicol Gaylor, Annie Gaylor's mother and co-founder of FFRF, passed away during the initial lawsuit filed by FFRF. Although the party to this lawsuit is technically the Estate of Anne Nicol Gaylor, we refer to her as "Nicol Gaylor" for brevity.

never denied them. *Freedom From Religion Foundation, Inc. v. Lew*, 773 F.3d 815, 825 (7th Cir. 2014) ("*Lew*").

In response, Gaylor and Barker filed amended tax returns for 2012 and 2013 claiming refunds for their housing allowances under § 107(2); Nicol Gaylor did the same for 2013. The IRS erroneously issued refunds to Gaylor and Barker for 2013 but made no decisions on plaintiffs' other claims. After more than six months without IRS action on plaintiffs' claims, FFRF and its employees brought this suit. The IRS then denied the 2012 refund claims because none of the claimants were ministers.

The Treasury Department moved to dismiss FFRF's § 107(1) challenge for lack of subject matter jurisdiction. The district court granted the motion for the same reasons we articulated in *Lew*: FFRF's employees never claimed a § 107(1) exemption. FFRF does not appeal that ruling. Later, the district court permitted several pastors who receive housing allowances and their associated religious organizations to intervene to defend § 107(2).[5]

The Treasury Department and intervenors moved for summary judgment. The district court denied their motions and instead granted summary judgment to FFRF and its employees. The court held that FFRF and its employees had standing to challenge § 107(2), and that that statute violates the Establishment Clause of the First Amendment. *Gaylor v.*

---

[5] The intervening defendants are Bishop Edward Peecher, the Chicago Embassy Church, Father Patrick Malone, the Holy Cross Church, the Diocese of Chicago and Mid-America of the Russian Orthodox Church Outside of Russia, and Pastor Christopher Butler. Each of the intervenors receive or provide housing allowances under § 107(2).

*Mnuchin*, 278 F. Supp. 3d 1081, 1104 (W.D. Wis. 2017). The court held that § 107(2) violated the secular purpose prong of the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and ruled that the statute's true purpose was to "provide aid to a group of religious persons." *Gaylor*, 278 F. Supp. 3d at 1099. The court rejected the argument that § 107(2) avoids excessive government entanglement with religion, because in the court's view "concerns about entanglement [do not] justify preferential treatment for religious persons." *Id.* The Treasury Department and the intervenors appeal.

## II.

Neither the Treasury Department nor the intervenors dispute the district court's ruling that FFRF has standing to challenge § 107(2). Nevertheless, even if the issue has not been raised, if there is no Article III standing our court must dismiss the suit. *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 (7th Cir. 2016). We evaluate standing to determine whether FFRF resolved the deficiencies we noted in *Lew*.

To establish Article III standing, plaintiffs must show they have suffered "(1) a concrete and particularized 'injury in fact' (2) that is fairly traceable to the challenged action of the defendant, and that is (3) likely to be redressed by a favorable judicial decision." *Lew*, 773 F.3d at 819 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To challenge the constitutionality of a tax provision, a plaintiff must have "personally claimed and been denied the exemption." *Lew*, 773 F.3d at 821.

An essential element of "injury in fact" is that the injury be "actual and imminent, not conjectural or hypothetical."

*Lujan*, 504 U.S. at 561 (internal quotations and citations omitted). When FFRF filed this action, Gaylor and Barker had yet to be denied a refund from their 2012 tax returns, and Nicol Gaylor had still, by the time of the district court's decision, received no answer to her 2013 refund request. Yet this does not necessarily mean FFRF lacked standing. Under 26 U.S.C. § 6532(a)(1), an income tax refund suit may be filed no earlier than six months after the refund claim was submitted. A statute cannot "'lower the threshold for standing below the minimum requirements imposed by the Constitution,' but Congress does have the power to 'enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.'" *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014) (quoting *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 294 (7th Cir. 2000)).

The district court concluded it was reasonable to interpret § 6532(a)(1) as rendering a claim "effectively denied if the IRS does not render a decision within six months." *Gaylor*, 278 F. Supp. 3d at 1087. We agree. As the district court noted, preventing a claimant from filing a refund suit until the IRS responded to the claim "would allow the IRS to deprive a party of standing indefinitely by withholding a decision." *Id.* at 1088. Several courts of appeals have cited the six-month filing requirement approvingly. *See, e.g.*, *Fletcher v. United States*, 452 Fed. App'x 547, 552 (5th Cir. 2011) ("[B]efore a taxpayer can bring a refund suit, he or she must … wait until either the IRS denies the claim or six months have expired since filing the administrative claim."); *Dumont v. United States*, 345 Fed. App'x 586, 590 (Fed. Cir. 2009) ("[A] suit … cannot be instituted until either the IRS denies the claim or six months pass without its taking action."); *Sorenson v. Sec'y of Treasury of*

*U.S.*, 752 F.2d 1433, 1438 (9th Cir. 1985), *aff'd*, 475 U.S. 851 (1986) ("The former section prohibits the courts from entertaining any refund suit filed before the expiration of six months from the date the claim for refund is filed … ."); *see also Lew*, 773 F.3d at 821 n.3 ("The plaintiffs could have … paid income tax on their housing allowance, claimed refunds from the IRS, and then sued if the IRS rejected *or failed to act upon* their claims.") (emphasis added).

Gaylor, Barker, and Nicol Gaylor have properly alleged a "concrete, dollars-and-cents injury." *Lew*, 773 F.3d at 821. "[T]hey have incurred a cost or been denied a benefit on account of their religion [or lack thereof]," *Arizona Christian Sch. Tuition Org. v. Winn*, 536 U.S. 125, 130 (2011), which confers Article III standing. Because its members have standing and the contested issue is germane to its organizational purpose, FFRF has organizational standing to sue as well. *See Sierra Club v. United States E.P.A.*, 774 F.3d 383, 388–89 (7th Cir. 2014) ("'An organization has standing to sue if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit.'") (quoting *Sierra Club v. Franklin Cty. Power of Ill. LLC*, 546 F.3d 918, 924 (7th Cir. 2008)).

## III.

This case comes to us after a grant of summary judgment, so we assess the parties' claims de novo. *Freedom from Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1045 (7th Cir. 2018) ("*Concord*").

Currently, Establishment Clause jurisprudence incorpo-
rates a number of tests when evaluating the constitutionality
of government action. Two are relevant to this case: the test
announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and the
"historical significance" test of *Town of Greece v. Galloway*, 572
U.S. 565, 576 (2014).[6] Because the Supreme Court has not clar-
ified which should take precedence, we evaluate FFRF's
claims under both tests and associated case law. *See Concord*,
885 F.3d at 1045 n.1 ("Indeed, there is debate among the Jus-
tices about the continuing validity of the endorsement
test. … For now, we do not feel free to jettison that test alto-
gether … .").[7] We consider this case under the *Lemon* test in

---

[6] A third relevant to this challenge, the endorsement test, clarifies
*Lemon* and is woven into our consideration of § 107(2) under the *Lemon*
test, particularly under the second prong. *See, e.g.*, *Freedom from Religion
Found., Inc. v. City of Marshfield, Wis.*, 203 F.3d 487, 493 (7th Cir. 2000), *as
amended on denial of reh'g and reh'g en banc* (Mar. 22, 2000) ("[T]he effect
prong of [the *Lemon*] test has been analyzed under the 'perception of en-
dorsement' test developed in *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984)
(O'Connor, J., concurring).").

[7] An amicus brief filed by Wisconsin and fifteen other states notes the
Supreme Court has not applied the *Lemon* test to a religious freedom case
in many years. Even so, until the Supreme Court explicitly overturns
*Lemon* we must apply it, as well as the other tests more recently relied
upon by the Court. Other circuit courts also apply multiple tests when
considering a challenge under the Establishment Clause. *See, e.g.*, *American
Humanist Assoc. v. McCarty*, 851 F.3d 521, 525–26 (5th Cir. 2017) (balancing
the *Lemon*, endorsement, and coercion tests against the historical signifi-
cance test in *Town of Greece*); *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*,
788 F.3d 580, 586–87 (6th Cir. 2015) (setting forth *Lemon*, the endorsement
test, and *Town of Greece* as the "three main jurisprudential threads" that
must be woven together in assessing government action under the Estab-
lishment Clause).

this Part of this opinion, and under the "historical significance" test in Part IV.

*Lemon* summarized prior case law into a three-prong test: "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." 403 U.S. at 612–13 (internal citations and quotations omitted). This test is not cumulative: if § 107(2) fails any of *Lemon*'s three prongs, it violates the Establishment Clause.

## A. Secular Legislative Purpose

We first examine whether § 107(2) has a secular legislative purpose. "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (citing *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 330 (1987)). A statute is unconstitutional under this test "only when … there [is] no question that the statute … was motivated wholly by religious considerations." *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984). The Treasury Department and intervenors point to three secular legislative purposes of the statute: to eliminate discrimination against ministers, to eliminate discrimination between ministers, and to avoid excessive entanglement with religion. FFRF counters that § 107(2) was passed to confer a government benefit on religion, which necessarily violates the Establishment Clause.

We will defer to a government's sincere articulation of secular purpose, so long as the plaintiffs have not proved that articulation of purpose is a sham. *Edwards v. Aguillard*, 482 U.S. 578, 586–87 (1987) ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham."); *Cohen v. City of Des Plaines*, 8 F.3d 484, 489 (7th Cir. 1993) ("We will defer to a municipality's sincere articulation of a secular purpose."). This does not mean "that the law's purpose must be unrelated to religion … ." *Amos*, 483 U.S. at 335. Instead, "the government lacks a secular purpose under *Lemon* only when 'there is no question that the statute or activity was motivated wholly by religious considerations.'" *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 527–28 (7th Cir. 2009) (quoting *Books v. Elkhart Cty.*, 401 F.3d 857, 863 (7th Cir. 2005), in turn quoting *Lynch*, 465 U.S. at 680). So we evaluate the purposes articulated by the Treasury Department to determine whether they are sincere, or whether the government's "'actual purpose is to endorse or disapprove of religion.'" *Edwards*, 482 U.S. at 585 (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)).

The Treasury Department first contends Congress passed § 107 to put ministers on equal footing with secular employees receiving the same benefits; in other words, to eliminate discrimination against ministers. The Treasury Department points to its 1921 decision to not exclude parsonages from taxable income and Congress's quick passage of the parsonage exemption, now codified at § 107(1), in response. The Treasury Department argues this is a secular purpose because it simply places religious employees on par with secular ones. FFRF counters that the benefits given to ministers under § 107(2) are different—and better—than those the tax code

gives to secular employees. FFRF argues putting ministers in a better position than secular employees promotes the dissemination of religious ideas and thus cannot be secular.

To determine whether § 107(2) confers a special benefit, or simply integrates ministers into an existing tax system, we must delve into the convenience-of-the-employer doctrine. Though the doctrine was originally developed in Treasury Department regulations, it has since been codified in several places. The principal statute is 26 U.S.C. § 119(a)(2) and exempts meals and lodging furnished to employees if they meet five requirements: the meal or lodging is furnished (1) by an employer to an employee, (2) in kind (as opposed to in cash), (3) on the business premises of the employer, (4) for the convenience of the employer, and (5) as a condition of employment. *See also* 26 C.F.R. § 1.119-1(b) (2018). This exemption applies generally: any qualifying employee can rely on § 119(a)(2), including religious employees.[8]

The express proof requirements of § 119(a)(2) are relaxed throughout the tax code for various types of employees. Section 119(c) exempts employees living in a foreign camp from needing to fulfill the "business premises" and "condition of employment" factors. Section 119(d) exempts certain teachers and university employees from the convenience-of-the-employer doctrine altogether, and allows them to exclude from taxable income the fair rental value of campus housing.

Myriad provisions in Title 26 employ this categorical approach and exempt any form of housing benefits, whether

---

[8] For additional history on the development of the convenience-of-the-employer doctrine, see *Commissioner v. Kowalski*, 434 U.S. 77, 84–96 (1977).

in cash or in kind: § 132 and § 162 exclude housing provided to an employee away on business for less than a year; § 134 excludes housing provided to current or former members of the military; § 911 excludes housing above a certain level provided to citizens or residents living abroad; § 912 excludes housing provided to government employees living abroad; and, of course, § 107 excludes housing provided to ministers. These categorical exemptions allow hundreds of thousands of employees (including ministers) to receive tax-exempt housing every year without needing to satisfy the proof requirements of § 119(a)(2).

These parallel provisions show an overarching arrangement in the tax code to exempt employer-provided housing for employees with certain job-related housing requirements. Congress has exempted certain categories of employees from complying with the specific requirements of § 119(a)(2) to simplify the application of the convenience-of-the-employer doctrine to those occupations. Section 107, including subsection (2), recognizes ministers often use their homes as part of their ministry. This provision thus eases the administration of the convenience-of-the-employer doctrine by providing a bright-line rule, instead of requiring that ministers and the IRS repeatedly engage with a fact-intensive standard.

Reading § 107(2) in isolation from the other convenience-of-the-employer provisions, and then highlighting the term "minister," could make the challenged statute appear to provide a government benefit exclusively to the religious. But reading it in context, as we must, we see § 107(2) is simply one of many *per se* rules that provide a tax exemption to employees with work-related housing requirements. *See* ANTONIN

SCALIA & BRYAN A. GARNER, READING LAW 252 (2012) ("'Several acts *in pari materia*, and relating to the same subject, are to be taken together, and compared in construction of them, because they are considered as having one object in view, and as acting upon one system.'") (quoting 1 James Kent, *Commentaries on American Law* 433 (1826)); *see also Mueller v. Allen*, 463 U.S. 388, 396 (1983) (upholding Minnesota tax deduction for tuition expenses, primarily used by parents of children at sectarian schools, in part because the deduction was "only one among many deductions—such as those for medical expenses … and charitable contributions … available under the Minnesota tax laws"). Congress's policy choice to ease the administration of the convenience-of-the-employer doctrine by applying a categorical exclusion is a secular purpose, not "motivated wholly by religious considerations." *Lynch*, 465 U.S. at 680.

FFRF argues considering the context of § 107(2) is inapt. To FFRF, the benefits the statute provides apply to a broader category of persons—any minister, as opposed to any minister that uses his or her home for religious purposes—than other categorical housing exclusions in the tax code. The district court agreed, and found that § 107(2) is not analogous to other bright-line housing benefit provisions in the tax code because, in comparison, it is overinclusive. *Gaylor*, 278 F. Supp. 3d at 1095 ("[Sections 134, 911, and 912] relate to employees whose housing is *necessarily* affected by their jobs. … Some ministers may be in a similar situation … but by no means are all ministers so restricted … .") (emphasis in original).

It is not immediately apparent that § 107(2) is broader than the other categorical exemptions for employee housing. For

example, under 26 U.S.C. § 911, any person living abroad is permitted to exclude or deduct housing expenses, regardless whether that person is living abroad at the behest of his or her employer.

But to the extent § 107(2) may be overinclusive, that alone does not render the statute unconstitutional. FFRF's argument is a critique of categorical rules generally, rather than of § 107(2) specifically. "Read literally, rules are generally overinclusive and underinclusive if assessed by references to their purposes. There is always a gap between the justification for a rule … and the rule itself." Cass R. Sunstein, *Problems with Rules*, 83 CALIF. L. REV. 953, 990–91 (1995). No rule will perfectly address the concerns to which it is addressed, because "[a]ll generalizations … are to some degree invalid, and hence every rule of law has a few corners that do not quite fit." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175, 1177 (1989). Categorical rules sacrifice precision of result for administrative ease and equality of result. So it is not surprising that § 107(2) covers some housing allowances that may be excluded under a case-by-case discretionary standard. In this respect, § 107(2) is not an outlier.

Important to our consideration, any imprecision does not make § 107(2) any less analogous to other "convenience-of-the-employer" related provisions in the tax code. Each covers a different subset of eligible taxpayers and activities, but they all serve a common purpose: excluding from taxable income certain employment-related expenses. The constitutionality of § 107(2) does not turn on which ministers the statute includes or excludes. *See, e.g.*, *Kowalski*, 434 U.S. at 95–96 ("[A]rguments of equity have little force in construing the boundaries of exclusions and deductions from income many

of which, to be administrable, must be arbitrary."); *Delong v. Dep't of Health & Human Servs.*, 264 F.3d 1334, 1343 (Fed. Cir. 2001) *("*Like all bright line rules, [the statute] is both over-inclusive and under-inclusive, but the imprecision of the statute does not make it unconstitutional.").

The second secular legislative purpose cited by the Treasury Department is elimination of discrimination between ministers. The government argues Congress passed § 107(2) because providing the tax exemption only to ministers given in-kind housing tended to exclude ministers of smaller or poorer denominations. FFRF argues this is a sham and the true justification was to subsidize religion, based on a statement made in the early 1950s by § 107(2)'s sponsoring representative Peter Mack: "Certainly, in these times when we are being threatened by a godless and antireligious world movement we should correct this discrimination against certain ministers who are carrying on such a courageous fight against this foe." *Hearings Before the Committee on Ways and Means: Statement of Hon. Peter F. Mack, Jr., on H.R. 4275, Concerning the Taxability of a Cash Allowance Paid to Clergymen in Lieu of Furnishing Them a Dwelling*, 83d. Cong. 1, at 1576 (June 9, 1953). The Treasury Department and intervenors respond by quoting other statements by Representative Mack from the same hearing, such as that the bill was proposed because "present tax laws are discriminatory among our clergy," *id.* at 1574–75, and because he believed "a serious injustice [was] being done to those ministers who must provide their own home," *id.* at 1576.

This smattering of legislative history does not establish Representative Mack's motives in proposing the bill. Even if

his first quote above did so, the motivation of one representative in a House of 435 does not definitively reveal the impetus behind the bill's passage. At the same hearing, other representatives stated different motives. Speaking on the same proposed provision, Representative Ray G. McKennan said the changes were proposed to "create an equitable condition for ministers similarly situated, and would probably eliminate court action [by ministers suing for discrimination]." *Id.* at 1574.

The legislative record does not establish a singular motive behind § 107(2). Conflicting statements among members of Congress—even by the same member—reveal the unreliability of this legislative history. Certainly, these statements do not render "a sham" the Treasury Department's proffered purpose of avoiding discrimination among religions. *Cf. Edwards*, 482 U.S. at 586–87. As such, we take the government at its word, which resolves this question. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Avoidance of discrimination against certain religions in favor of others is a permissible secular legislative purpose.

The third secular legislative purpose cited by the Treasury Department is to avoid excessive entanglement with religion. To the government, Congress's decision to exempt ministers from the proof requirements of § 119(a)(2) prevents the IRS from conducting intrusive inquiries into how religious organizations use their facilities. *See, e.g., Amos*, 483 U.S. at 339 ("avoid[ing] … intrusive inquiry into religious belief …" prevents entanglement). FFRF responds that § 107(2) does not

avoid such entanglement because the IRS must still administer a test to determine whether a taxpayer qualifies as a minister. FFRF argues this is as fact-intensive an audit as the inquiry administered for the generally applicable statutory exemption, § 119(a)(2).

On this entanglement question, two Supreme Court decisions are particularly instructive. In *Walz v. Tax Comm. of City of N.Y.*, the Court upheld a New York property tax exemption for properties owned by churches and used exclusively for religious worship. *Walz* disagreed with the lower court's examination of churches' contribution to the social welfare to determine whether the tax exemption had a secular purpose:

> To give emphasis to so variable an aspect of the work of religious bodies would introduce an element of governmental evaluation and standards as to the worth of particular social welfare programs, thus producing a kind of continuing day-to-day relationship which the policy of neutrality seeks to minimize.

397 U.S. at 674. Similarly, in *Amos v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints*, the Supreme Court upheld a categorical exemption for religious organizations from the provisions of Title VII of the Civil Rights Act of 1964. The opinion noted that, under *Lemon*, "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 335.

Any financial interaction between religion and government—like taxing a church, or exempting it from tax—entails

some degree of entanglement. But only *excessive* entanglement violates the Establishment Clause. *See Walz*, 307 U.S. at 674 ("We must also be sure that the end result—the effect—is not an excessive government entanglement with religion.") Crucial to our evaluation, the Supreme Court has already permitted the level of entanglement incurred under § 107(2). In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012), the Court inquired into the facts underlying Hosanna-Tabor's employment to determine whether she was a minister. *Id.* at 190–92. The IRS does the same under § 107(2) to determine whether a taxpayer qualifies as a minister. The Court would not have so inquired if it violated the Establishment Clause.

In contrast, the application of § 119(a)(2) to ministers would entangle church and state far more than under § 107(2). For example, to determine what constitutes the business premises of the employer under § 119(a)(2), the IRS would have to determine what the "business" of the church is and where and how far the "premises" of the church extend. *See* EDWARD A. ZELINSKY, TAXING THE CHURCH 168–69 (2017). To do so, the IRS would need to interrogate ministers on the specifics of their worship activities, even determine which activities constitute "worship." Such government inquiries into the internal affairs of churches to determine their eligibility for tax relief have been rejected as excessive entanglement. *See, e.g.*, *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 708–20 (1976) (holding civil courts cannot interfere with the rulings of ecclesiastical tribunals on church affairs); *Schleicher v. Salvation Army*, 518 F.3d 472, 475 (7th Cir. 2008) ("Congress does not want courts to interfere in the internal management of churches … .").

Worse, if subject to § 119(a)(2), congregations might alter their religious activities to attempt to conform with its requirements. Congress enacted § 107(2) in part to avoid that. And congressional action "to minimize governmental interference with the decision-making process in religions … does not violate the Establishment Clause." *Amos*, 483 U.S. at 336 (internal citations and quotations omitted).

The categorical nature of § 107(2) also avoids excessive entanglement by providing ministers and their churches certainty as to whether their housing allowances will be exempt from tax. In *Amos*, the Supreme Court held "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." *Amos*, 483 U.S. at 336.

Recognizing the potentially excessive entanglement threatened by the application of § 119(a)(2) to ministers, Congress enacted a less-entangling tax exemption. Seeking to avoid government entanglement is a secular legislative purpose under *Lemon*. *See, e.g., Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1231 (10th Cir. 2017) ("[T]he Supreme Court has expressly held that a purpose of avoiding government entanglement does not violate the Establishment Clause.") (citing *Amos*, 483 U.S. at 335). Because the government has articulated not one, but three secular purposes, we conclude the first prong of *Lemon* is satisfied.

### B. *Primary Effect of Advancing or Inhibiting Religion*

The second prong of the *Lemon* test requires that a statute have a "principal or primary effect … that neither advances nor inhibits religion." *Lemon*, 403 U.S. at 612. "For a law to have forbidden 'effects' under *Lemon*, it must be fair to say

that the *government itself* has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337 (emphasis in original). This entails "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz*, 297 U.S. at 668.

FFRF contends the Supreme Court's holdings in *Amos* and *Walz* were superseded by Justice Brennan's plurality opinion in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989). That case resolved an Establishment Clause challenge to a state tax exemption for religious publications. To determine whether Justice Brennan's opinion controls, we examine the grounds for decision in *Texas Monthly*'s various concurrences. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.").

In *Texas Monthly*, Justice Brennan authored an opinion joined by Justice Marshall and Justice Stevens and announced the result of the case; Justice White concurred in the result and wrote separately; Justice Blackmun concurred in the result and wrote for himself and Justice O'Connor; and Justice Scalia filed a dissenting opinion, joined by Chief Justice Rehnquist and Justice Kennedy. Justice Brennan's opinion concluded that the tax exemption for religious publications violated the Establishment Clause because "[e]very tax exemption constitutes a subsidy that affects nonqualifying taxpayers." *Texas Monthly*, 489 U.S. at 14 (Brennan, J., plurality opinion). He stated any subsidy directed "exclusively to religious organi-

zations that is not required by the Free Exercise Clause … cannot but convey a message of endorsement to slighted members of the community." *Id.* at 15 (internal citations and quotations omitted).

The other opinions in *Texas Monthly* were narrower in scope. Justice White's concurrence reached the same result, but on an independent ground, the Press Clause. Justice Blackmun's concurrence agreed that the tax exemption violated the Establishment Clause, but did not adopt many of Justice Brennan's sweeping statements. Justice Blackmun urged that the case be resolved narrowly and concluded only that "a tax exemption *limited to* the sale of religious literature by religious organizations violates the Establishment Clause." *Id.* at 28 (Blackmun, J., concurring) (emphasis in original). Because Justice Blackmun decided the case on Establishment Clause grounds,[9] and on a narrower basis than Justice Brennan's opinion, under the *Marks* rule Justice Blackmun's concurrence sets the rule of decision of *Texas Monthly*. His concurrence did not comment on what constitutes a forbidden effect under *Lemon*, so *Texas Monthly* does not alter our analysis of this second prong.

---

[9] Even if Justice White's opinion were based on narrower grounds than Justice Blackmun's opinion, it reached the same result under a different constitutional clause. "*Marks* applies 'only when one opinion is a logical subset of other, broader opinions.'" *Gibson v. American Cyanamid Co.*, 760 F.3d 600, 619 (7th Cir. 2014) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). Justice Blackmun's opinion provided the fourth and fifth votes in *Texas Monthly* and shared the "common denominator" of resolving the issue under the Establishment Clause, so it controls. *Gibson*, 760 F.3d at 619 (quoting *United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009)).

With *Walz* and *Amos* still in effect, we evaluate forbidden effects under their framework. FFRF contends a tax exemption for religion is identical to a government subsidy for religion. In economic terms, a subsidy and a tax exemption may have the same practical impact. *See, e.g.*, Adam Chodorow, *The Parsonage Allowance*, 51 U.C. DAVIS L. REV. 849, 854 (2018) ("The claim that exemptions differ from direct subsidies for Establishment Clause purposes simply ignores economic reality."). But the Supreme Court has already found a constitutionally significant difference between the two on taxing religion. "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." *Walz*, 397 U.S. at 675.[10]

Under *Walz* and *Amos*, then, § 107(2) does not advance religion on behalf of the government. Providing a tax exemption does not "connote[] sponsorship, financial support, and active involvement of the [government] in religious activity" under *Walz*, 397 U.S. at 668; *see also Amos*, 483 U.S. at 337 ("[W]e do not see how any advancement of religion achieved by the [exempt religious organization] can be fairly attributed to the Government, as opposed to the Church.").

Under these precedents, the primary effect of § 107(2) is not to advance religion on behalf of the government, but to

---

[10] The Supreme Court tacitly reaffirmed this approach in its standing discussion in *Arizona Christian Sch. Tuition Org. v. Winn*, 536 U.S. 125 (2011). There, it held taxpayers had no standing to challenge a tax credit directed primarily towards sectarian schools because "[w]hen the government declines to impose a tax, … there is no … connection between dissenting taxpayer and alleged establishment." *Id.* at 142.

"*allow*[] churches to advance religion, which is their very purpose." *Amos*, 483 U.S. at 337 (emphasis in original). So § 107(2) passes the second prong of *Lemon*.

### C. *Excessive Entanglement with Religion*

The third prong of the *Lemon* test is whether the state "foster[s] 'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 613 (quoting *Walz*, 397 U.S. at 674). We have addressed this prong in Part III.A above. Because some level of church-state interaction is unavoidable, "[e]ntanglement is a question of kind and degree." *Lynch*, 465 U.S. at 684. Section 107(2) avoids government inquiry into the use of a minister's home, but it still requires the IRS to determine who qualifies as a minister eligible for the exemption. Even if the IRS's test for who qualifies as a minister involves entanglement, it is of a nature approved by the Supreme Court in *Hosanna-Tabor*. *See Hosanna-Tabor*, 565 U.S. at 190–95 (engaging in a fact-bound analysis to determine whether the petitioner qualified as a minister). The alternative would be to force ministers to comply with the far more detailed and particular, and thus more entangling, requirements of § 119(a)(2).

In answer to these concerns, Congress chose to enact § 107(2). Legislative determinations about the Establishment Clause, while not binding, are entitled to deference. "We in the Judiciary must be wary of interpreting [the Religion] Clauses in a manner that negates the legislative role altogether." *Texas Monthly*, 489 U.S. at 28 (Blackmun, J., concurring). Legislative deference is particularly great for classifications in tax legislation. *See, e.g.*, *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 547 (1997) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."); *Madden v. Kentucky*,

309 U.S. 83, 88 (1940) (holding that for tax classifications challenged under the Fourteenth Amendment, "the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes"). Congress decided § 107(2) is the less entangling option, so we will not disturb it.

We conclude § 107(2) has a secular legislative purpose, its principal effect is neither to endorse nor to inhibit religion, and it does not cause excessive government entanglement. Here, "[t]here is no genuine nexus between tax exemption and establishment of religion." *Walz*, 397 U.S. at 675. Section 107(2), then, does not violate the Establishment Clause under the *Lemon* test.

## IV.

We next examine whether § 107(2) passes the historical significance test.[11] The Supreme Court has held "the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) (quoting *Cty. of Allegheny v. Am. Civil*

---

[11] FFRF and amici curiae supporting appellees' position offer no arguments under the historical significance test, except to assert the test applies only to legislative prayer. We find no such limitation. Though *Town of Greece* addressed legislative prayer, it stated that "the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" 572 U.S. at 576 (quoting *Cty. of Allegheny*, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part)). This language does not limit the application of the *Town of Greece* standard to constitutional challenges to legislative prayer. As this part discusses, other Supreme Court cases have examined relevant history as to monuments as well as the ministerial exception.

*Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 670 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part)). This fact-bound test was developed in three cases. First, in *Van Orden v. Perry*, 545 U.S. 677 (2005) (plurality opinion), the Court considered whether a monument inscribed with the Ten Commandments on Texas government property violated the Establishment Clause. *Van Orden* criticized the *Lemon* test for ignoring the "strong role played by religion and religious traditions throughout our Nation's history." *Id.* at 683. Instead, the Court reviewed a number of historical examples of governments referencing God and displaying the Ten Commandments without issue. On that basis, the Court held the monument did not violate the Establishment Clause. *Id.* at 692.

Next, in *Hosanna-Tabor*, a unanimous Supreme Court held that the Establishment Clause prevents governments from interfering with the decision of a religious group to terminate one of its ministers. In so deciding, the opinion explored the history of church-state relations in the United States and England, back to the Magna Carta. *Hosanna-Tabor*, 565 U.S. at 182. From that history, the Court determined that the First Amendment was adopted in part to prevent "the new Federal Government—unlike the English Crown—[from a] role in filling ecclesiastical offices." *Id.* at 184. This determination formed the basis of the Court's decision.

Finally, in *Town of Greece* the Supreme Court applied the historical significance test when it held legislative prayer does not violate the Establishment Clause. The Court held that "[a]ny test the Court adopts [for the Establishment Clause]

must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 572 U.S. at 577.

We now apply the historical significance test to this case. FFRF offers no evidence that provisions like § 107(2) were historically viewed as an establishment of religion. The government and intervenors, and amici curiae supporting their position, have provided substantial evidence of a lengthy tradition of tax exemptions for religion, particularly for church-owned properties. For over two centuries, the states have implemented church property tax exemptions in various forms. *See* John Witte, Jr., *Tax Exemption of Church Property: Historical Anomaly or Valid Constitutional Practice?*, 64 S. CAL. L. REV. 363, 380 (1991) ("The colonial law exemption of church property continued largely uninterrupted in the early decades of the American republic."); *see also id.* at 389–95 (detailing state protections for religious tax exemptions from the late 19th to early 20th centuries). When challenged on establishment grounds, such tax exemptions typically have been upheld. *See, e.g.*, *Trustees of Griswold College v. State*, 46 Iowa 275, 282 (1877) (ruling the state constitution's Establishment Clause "does not [implicate] the exemption from taxation of such church property as the legislature may think proper").

Congress has enacted federal tax exemptions for religious organizations as far back as 1802, when it permitted the County of Alexandria (then under federal control) to exempt church property from taxation, *see* 7 Cong. Ch. 53, May 3, 1802, 2 Stat. 194, and as recently as 2002, the last time § 107 was amended. *See* Clergy Housing Allowance Clarification Act of 2002, Pub. L. No. 107–181, 116 Stat. 583. As early as

1885, the U.S. Supreme Court acknowledged and accepted religious property tax exemptions in *Gibbons v. District of Columbia*, 116 U.S. 404 (1886), "reflecting more than a century of our history and uninterrupted practice." *Walz*, 397 U.S. at 680. Today, more than 2,600 federal and state tax laws provide religious exemptions. NINA J. CRIMM & LAURENCE H. WINER, POLITICS, TAXES, AND THE PULPIT: PROVOCATIVE FIRST AMENDMENT CONFLICTS 43 (2011).

The district court distinguished § 107(2) from this long and continuing historical tradition of property tax exemptions by noting the statute is an income tax exemption. We find this too fine a distinction, as it ignores the impact of the Sixteenth Amendment. Before 1913, Congress could not constitutionally tax housing provided to ministers as part of their income. *See Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 637 (1895) (invalidating a state income tax). Within a few years of income becoming taxable, Congress moved to exclude parsonages from income, and a few decades later excluded cash housing allowances as well. Congress was continuing its "historical practice[]" of exempting certain church resources from taxation. *Town of Greece*, 572 U.S. at 576. This endeavor limits entanglement between church and state, *see supra* at Part III.C. Given this history, we conclude § 107(2) does not violate the Establishment Clause under the historical significance test.

## V.

FFRF claims § 107(2) renders unto God that which is Caesar's. But this tax provision falls into the play between the joints of the Free Exercise Clause and the Establishment Clause: neither commanded by the former, nor proscribed by

the latter. We conclude § 107(2) is constitutional. The judgment of the district court is REVERSED.