T.C. Memo. 2019-69

UNITED STATES TAX COURT

MIKEL A. BROWN, SR., AND DEBRA A. BROWN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26090-13.                    Filed June 10, 2019.

Mikel A. Brown, Sr., and Debra A. Brown, pro sese.

<u>Maria Cerina De Ramos</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  We can take judicial notice, because there can be no

dispute, that western New York has made outstanding contributions to American

[*2] cuisine: scrumptious beef on weck,[1] delicious Buffalo-style pizza,[2] sweet sponge candy,[3] and the incomparable spaghetti parm.[4] But this case wafted to our Court from the perfumed aroma of the deep fryers of a restaurant in Alamogordo, New Mexico.

The couple in charge of those fryers was Cynthia and Brian Harris. They are natives of Buffalo and missionaries to the Southwest of the Nickel City's most famous local food--the Buffalo wing. In 2008 they opened their restaurant named A Taste of Buffalo with the help of another couple, Mikel and Debra Brown. The local population, however, seemed to prefer food called "Tex-Mex" and

---

[1] A tasty roast-beef sandwich on a special roll. See Larry Olmsted, Buffalo, N.Y.'s Famous Beef on Weck Sandwich, USA Today (Oct. 5, 2017), https://www.usatoday.com/story/travel/columnist/greatamericanbites/2017/10/05/beef-weck-sandwich-buffalo-new-york/731420001/.

[2] Not too thin, and not too thick. See Arthur Bovino, Is America's Pizza Capital Buffalo, New York?, The Daily Beast (Aug. 13, 2018), https://www.thedailybeast.com/is-americas-pizza-capital-buffalo-new-york.

[3] Light-as-air chocolate on the outside with a crispy, crunchy "sponge" of delicate caramelized sugar on the inside. See Aaron Besecker, Buffalo's Day to Celebrate Sponge Candy, Gusto (Nov. 17, 2016), https://buffalonews.com/2016/09/21/buffalos-day-celebrate-sponge-candy/.

[4] A bowl of spaghetti covered in melted mozzarella cheese and accompanied by a side of marinara sauce. Topped off with grated cheese by request. (No citation necessary.)

**[*3]** something called "Bar-B-Q". The Harrises' wings fell on rocky ground; the restaurant closed.

The Commissioner says that the Browns did not materially participate in the restaurant's business and so are not entitled to deduct their share of the restaurant's losses and other expenses. His audit also discovered what he claims is a significant amount of unreported income.

## FINDINGS OF FACT

A.    Christian Joy Center

A major part of the Browns' tax troubles stems from the breadth of their work: A Taste of Buffalo was not their major activity in the tax years at issue here--2007-09. Their focus was on Christian ministry, and Reverend Mikel Brown is the founder and longtime pastor of an independent church named the Christian Joy Center (CJC); his wife Debra is its administrator. Reverend Brown is well-credentialed, with a doctorate in biblical studies and a degree in social psychology. Before pursuing his vocation as a clergyman, he served six years in the military and founded an insurance agency.

The CJC is headquartered in El Paso, Texas with satellite locations in Alamogordo and Phoenix. These churches are far from each other, and Reverend

**[\*4]** Brown had to travel from El Paso to southern New Mexico and Arizona to oversee the CJC's network of pastors and elders.

It's not precisely correct to say that a minister is an entrepreneur, but Reverend Brown's charismatic presence as a motivational speaker tapped markets outside of the CJC. This led to his hosting and participating in public-speaking engagements both locally and across the nation, which he did through his sole proprietorship, Power Communications Network (PCN). This in turn led him to become his own impresario, at least for his local appearances, as he scheduled and paid for venues, hired caterers, and handled all advertising and participant registration. In addition to running a thriving network of churches and a public-speaking and event-management business, he founded and ran a training operation called Dream Makers 99.[5]

Mrs. Brown is at least as busy as her husband. She earned a degree in nursing and worked as a military nurse before beginning her career at the CJC. At the CJC she serves as the church administrator, as well as the administrator of the CJC Academy--the church's nursery, preschool, and elementary-school program. As the Academy's administrator, she develops and oversees the curriculum, hires

---

[5] Started in 1999, Dream Makers 99 is an entrepreneurship center that puts on seminars and continuing education at an annual event for business owners interested in improving their business productivity.

[*5] all teachers and staff, pays the bills, and manages the Academy's daily operations. These responsibilities generally required her to be at the Academy eight hours a day, Monday through Friday, for all the years at issue. She nevertheless found time to drive the Reverend to his speaking engagements and to make the six-hour roundtrip trek between the CJC's El Paso and Alamogordo locations whenever he had back-to-back services. Mrs. Brown also accompanied him to the CJC's other locations from time to time.

### 1. Parsonage Allowance

The Browns received what they claim is a parsonage allowance from the CJC for each of the years at issue. According to Reverend Brown, the CJC's church board determines and approves this allowance annually, and in 2007 it was made in the form of two payments of $1,750 deposited into the Browns' personal checking account each month. For 2008 and 2009 the total parsonage payments are unclear: There's a trail of consistently uniform payments in 2008, but then it becomes harder and harder to follow in later months. The CJC also paid the Browns' utility bills and, more irregularly, other seemingly personal expenses.

### 2. Love Offerings From Congregants

Like many churches, the CJC uses an envelope system to collect and properly record offerings from its members. The CJC has a single envelope form

**[*6]** for this purpose, with blank lines for congregants to fill in their contact information, if they choose, and spaces for different contribution categories next to which they can list a dollar amount. These categories include "tithe", "offering", "building fund", and "special gift."[6] Contributions designated for the first three categories are always recorded in the CJC's books as contributions to the church. A special gift designated for Reverend Brown (or anyone else) is noted on the envelope. If one of these special gifts was by check or credit card, it would first go into the CJC's account, and the bookkeeper would later make a check out to the Browns. Not all contributions made to Reverend Brown were made through the envelope system, and therefore not all were recorded by the CJC.[7]

---

[6] As the CJC uses the terms: a "tithe" means "a tenth of a member's income" as instructed by the Bible; an "offering" is "whatever [an] individual would like to give to the church;" the "building fund" is for donations in support of church construction and maintenance; and "special gifts" are offerings made with a "special intention," such as "for [the] healing of a family member," or to a specific person on the church's staff.

[7] The CJC's bookkeeper wasn't exactly clear on what happens with checks. At one point she made it seem that all checks from congregants designated as special gifts are put into the system along with credit-card payments, and Reverend Brown would get a check from the CJC for the total amount. But she also testified that only the checks made out to the CJC, but identified as gifts for Reverend Brown would go through this process. The record includes a large number of checks from the CJC members made out to Reverend Brown directly that he or Mrs. Brown deposited directly into their personal bank account. We think it more likely than not that only credit-card donations and special-gift checks

(continued...)

**[*7]** The Browns do not tell members of the congregation that these payments designated as special gifts are tax-deductible.

B.    A Taste of Buffalo

The Harrises are members of the CJC and became friends of Reverend and Mrs. Brown.  By the time they met the Browns, the Harrises had already opened and closed their first restaurant, but were eager to get back into the business.  The Harrises gradually concluded, after some discussion with the Browns, that they would have more success if they combined efforts and went into business together. The Harrises had the restaurant equipment and the experience; the Browns had capital from their successful ventures, and Reverend Brown in particular had a good deal of practical business knowledge.  Both couples thought these diverse resources would combine well and might lead to success the second time around. One partnership agreement and a good deal of planning later, A Taste of Buffalo, LLC (ATOB), opened its doors in March 2008.  The couples agreed to own ATOB as equal partners and to make Mr. Harris the manager.  ATOB was to be a counter-service restaurant, so the Harrises and the Browns limited their staff to about "six

---

[7](...continued)
from congregants that were made out to the CJC were entered into the CJC's system this way.  We find that checks made out to Reverend Brown were given to him directly, even if first collected by the CJC during a church service.

[*8] or seven" at any given time to work the cash register and the food counter. All of ATOB's employees were hired by and reported to the Harrises.

The Browns were not just investors, however. They were especially active during the startup of the business: They traveled to Alamogordo to meet with realtors and contractors to scout different locations and look at equipment, helped pick the sauces that are an essential part of the Buffalo wing experience, and chose the restaurant's furnishings. As the opening approached, the Browns helped install some of the fixtures and create a menu. But the Harrises also participated in the hunt for the right location and managed ATOB's day-to-day operations once it opened. ATOB was closed on Sundays, but the Harrises spent around 12 hours at the restaurant all other days of the week. The Browns, in contrast, were there only two or three times a week to bring needed supplies from El Paso, plan and draft advertising, and generally help with "[j]ust whatever needed to get done." Reverend Brown also handled ATOB's finances--he was the partner in charge of ordering and tracking supplies, and he wrote checks as bills came due and payroll needed to be made. Beyond this the Harrises looked to the Browns for moral support and help with "certain little things" to "[s]tay[] in it." Mr. Harris estimated that Reverend and Mrs. Brown spent an average of 50 hours each week, onsite and offsite, on ATOB during the years at issue although he never actually

[*9] kept track.  The Browns were more precise, and claimed to have spent a more plausible 714 hours at ATOB in 2007, though all the while Reverend Brown continued to run the CJC, Dream Makers 99, and PCN.

Even though all the witnesses agreed that ATOB "had very good food," Alamogordo's appetite for Buffalo wings was smaller than they had expected.  By the end of 2009 ATOB still hadn't earned a profit, and it sputtered to a stop in March 2010.  The Browns stood to lose the most from ATOB's failure, since-- short of the Harrises' covering some grocery bills here and there--they had been the only source of the restaurant's capital.  And the Browns deducted nonpassive losses of around $30,000 for both 2007 and 2008.  The Harrises and the Browns were not done with the restaurant business, though.  Within a year of ATOB's closing, they gave in to local tastes and opened Chi-Town Barbecue in Fort Bliss, Texas.  This cuisine proved more popular, and the restaurant was running smoothly as of the time of trial.

**[*10]** C.     Schedule C Expenses

The Browns claimed large deductions for car expenses on their 2007-09

Schedules C, Profit or Loss From Business,[8] but the Commissioner thought they'd

overserved themselves and disallowed chunks of these deductions.  Here's a table:

| Year | Schedule C lease and vehicle expenses at issue | Allowed | Contested |
|---|---|---|---|
| 2007 | $18,000 | $14,659 | $3,341 |
| 2008 | 27,250 | 23,163 | 4,087 |
| 2009 | 18,801[1] | 16,545 | 2,256 |

[1] This is the amount listed by the Commissioner in the notice of deficiency. For some reason, in both the Commissioner's answering brief and the Browns' reply brief, this number was changed to $52,891.  We aren't sure where this number came from, but the parties agree that only $2,256 of the Browns' 2009 car expenses is contested.

The Browns introduced two car leases into the record--one that ran from

2003 to 2007, and another from 2007 to mid-2011.  The monthly payments on the

two leases show yearly totals of about $15,000 for 2007--a year that saw a three-

month gap in leasing expenses--and about $22,000 for both 2008 and 2009.  The

Browns did not produce any other record of their car-related expenses.  Reverend

---

[8] The Browns reported their vehicle expenses differently each year.  For 2007, they listed them as "[r]ent or lease" of "[v]ehicles, machinery, and equipment;" for 2008, as "[c]ar and truck expenses;" and for 2009, as "[o]ther expenses."

[*11] Brown did refer to a mileage log in his testimony, but did not introduce it at trial.  The Browns admitted that they used the leased cars for both personal and business purposes.

D.　　Return Preparers, Audit, and Trial

The Browns hired two different preparers for their 2007-09 returns.  Their longtime tax preparer, Gerald Blaes, drafted both their personal and ATOB's partnership returns for tax year 2007.  Mr. Blaes is not a licensed accountant, but he has a degree in accounting and had prepared returns since "the late '80s, early '90s."  Mr. Blaes was an engaging and credible witness.  We believed him when he said his client policy was simple:  "If you lie to me and I find out about it, you can find somebody else to do your taxes."  We believed Mr. Blaes when he said that Reverend Brown never asked him to "fudge the reports" and that, to his knowledge, Reverend Brown never lied to him.  We also believed him when he said that he didn't feel fully comfortable preparing ATOB's partnership return because of his lack of experience with such returns, and that he asked Reverend Brown to have it reviewed by a CPA before filing.  We do find that Mr. Blaes asked for and received some information that he used to prepare the returns.  But he neither asked for nor knew anything about the extent of the Browns' participation in ATOB.  He also did not ask, and was not told, about the

[*12] congregants' gifts made to Reverend Brown; the Browns simply gave him a Form 1099-MISC, Miscellaneous Income, created by the CJC's bookkeeper, which Mr. Blaes used to prepare the return.

It's unclear whether the Browns followed Mr. Blaes' advice to have ATOB's 2007 return reviewed by a CPA more familiar with partnership taxation before they filed it. But tax year 2007 was the last tax year Mr. Blaes prepared returns before he retired from the business. The Browns turned to Teresa Self to prepare their 2008 and 2009 tax returns. Ms. Self *is* a CPA, and had done some accounting for the CJC. She, however, usually asked her clients only for a summary of expenses and totals since "you trust [that] the client[s]" have the records to support their positions if they say they do. She'd occasionally ask a client to confirm a number if "something was out of whack," and then they'd "discuss whether it would go on the return or not." And she followed her usual method when she prepared the Browns' returns. She neither saw nor asked for logs of hours the Browns spent working for ATOB or for any other documentation to support the Browns' deductions. She too said she was unaware that the Browns received money from parishioners and therefore did not advise them as to the taxability of such amounts. And Ms. Self also did not have much experience with preparing partnership returns, filling out "[m]aybe two or three * * * a year."

[*13] Though the Browns claim that partnership returns for ATOB were prepared and filed, the Commissioner has no record of them for any of the years at issue.

The Browns' audit began with their 2007 tax year, and Revenue Agent (RA) Kevin Freitas suspected during its course that the Browns had not kept adequate records of their income. He therefore decided to analyze their bank deposits. He started with 2007, a year when the Browns had a checking account at Wells Fargo and Reverend Brown had an account at Inter National Bank. RA Freitas added the total deposits made into these two accounts and then subtracted what the Browns reported as income on their return. These deposits almost all came from the CJC and Reverend Brown's speaking engagements. Because the deposits far exceeded their reported income for the year, he asked the Browns to identify as many of the deposits as they could so that he could exclude any nontaxable items (e.g., insurance proceeds, refinanced loans, gifts). After making some adjustments, he arrived at a total of more than $150,000 in underreported gross income for the year. This prompted him to do a similar analysis of the Browns' 2008 and 2009 deposits, and he concluded that the Browns had underreported income by more than $200,000 for tax year 2008, and by nearly $120,000 for tax year 2009. For these two years, however, RA Freitas did not sit down with the Browns to go over each deposit.

[*14] After the audit, the Commissioner issued a notice of deficiency for all three tax years in which he made several adjustments and said the Browns were liable for penalties under section 6662(a).[9] The Browns disagreed and timely petitioned our Court. We tried the case in El Paso.[10]

We must decide whether:

- the Browns underreported their Schedule C gross receipts and, more specifically, whether they can exclude any of this income as parsonage allowances or gifts for tax years 2007-09;

- their Schedules E, Supplemental Income and Loss, losses from ATOB are subject to the passive-loss limitation rules for tax years 2007 and 2008;[11]

- they are entitled to disallowed deductions for Schedule C car expenses for tax years 2007-09; and

---

[9] All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[10] The Browns lived in Texas at all relevant times, which means this case is presumptively appealable to the Fifth Circuit. See sec. 7482(b)(1)(A).

[11] ATOB's status in 2009 is obscure. It hadn't closed yet, but the Browns claimed no losses from ATOB on their 2009 income tax return, which likely led the Commissioner not to audit ATOB's distributive shares of expenses that year. And just as for the 2007 and 2008 tax years, the Commissioner has no record of a 2009 partnership return's being filed for ATOB.

[*15] •      they are liable for accuracy-related penalties for all years at issue.[12]

OPINION

I.     Underreported Income

This isn't the first case where a pastor did not report as taxable income some of the money received from his congregation. See, e.g., Felton v. Commissioner, T.C. Memo. 2018-168. As we explained there, the relationship between a pastor and his congregation is not typically viewed as commercial, which makes the line between gifts and compensation blurrier than in less sacred places. But we begin with a more detailed review of how the Commissioner determined that the Browns came up short on their reported income.

A.     Bank-Deposits Analysis

When a taxpayer does not keep adequate records of his income, the Commissioner may reconstruct it, see secs. 6001, 446(b), and may analyze the taxpayer's bank deposits to do so, see Parks v. Commissioner, 94 T.C. 654, 658 (1990). A bank-deposits analysis assumes that all money deposited in a taxpayer's

---

[12] We don't need to decide whether the burden of proof shifted to the Commissioner because we were able to decide each issue by a preponderance of evidence. See Knudsen v. Commissioner, 131 T.C. 185, 188-89 (2008) (citing Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212).

[*16] bank account during a given period is taxable income, and unexplained deposits are considered *prima facie* evidence of income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); see also Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964). Taxpayers then have the burden to show that such deposits shouldn't be taxed because they were inheritances, loan proceeds, transfers from another personal account, or other nontaxable transfers. See Price, 335 F.2d at 677. The Commissioner has to subtract reported income and income from nontaxable sources that he knows about. Id. If taxpayers believe the Commissioner's method of computation is unfair or inaccurate, however, they have the burden to show that unfairness or inaccuracy. Id.

The Browns first claim that RA Freitas failed to conduct a full investigation for the 2007 tax year, but they raise no issue with any particular part of his analysis. For their 2008 and 2009 tax years, the Browns likewise claim that RA Freitas "did not properly employ the bank deposit method" and "merely subtracted" the Browns' reported income from their total bank deposits. They assert that this means they have "demonstrat[ed] that Respondent[]'s determination is erroneous" and therefore the burden of proof shifts back to the Commissioner to show that his analysis was correct. The Commissioner disagrees.

[*17] We find nothing wrong with the way RA Freitas did his analysis of the Browns' 2007 tax year. He reviewed all the deposits with the Browns, and removed (or subtracted as nontaxable) a good many of them. It is true that he did not do an item-by-item review of his analysis with the Browns of their 2008 and 2009 tax years, but there's nothing that requires him to do so. The Browns were free to point out at trial all the deposits in those years that they believed were nontaxable. They did claim that they refinanced their home in "2007 or '[0]6" and transferred pieces of the lump sum that they received into their personal checking account from time to time. They also claim that USAA gave them $25,000, or "somewhere about that," in insurance proceeds for water damage to their home. But they failed to back up these claims with any paperwork that showed a refinancing or insurance claim. And this failure, when we combine it with a lack of specificity as to dates and amounts, leads us to find that it is more likely than not that none of the large deposits for any of the years at issue were nontaxable loan or insurance proceeds. They question RA Freitas's analysis, but without specific evidence that he included specific deposits that he shouldn't have, their questions are fruitless.

We did look at the record ourselves, and did find a handful of small deposits that we think are more likely than not nontaxable--a $100 payment from

**[*18]** Countrywide Home Loans, Inc., on January 10, 2008, that seems to be a small loan; a March 10, 2008, payment of $180 from Wells Fargo Home Mortgage "for payment of escrow to mortgagor" that seems to be a refund of overpayment; and two insurance payments from Chubb Lloyds Insurance Company of Texas totaling $1,490 on July 23 and September 8, 2009.  With these small exceptions, we find it more likely than not that RA Freitas's analyses for all three years were correct.

B.     Parsonage Allowances and Gifts

This conclusion, however, is only as to the total of potentially taxable amounts.  The Browns' major argument is that many of those deposits are nontaxable either as parsonage allowances or as gifts.

We look at each possibility in turn.

1.     Parsonage Allowances

Section 107(2)[13] says that a minister does not have to include in gross income "the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home."  This exclusion is limited to the amount used "to rent or provide a home" and may "not exceed the fair rental value of the

---

[13] The Seventh Circuit very recently upheld the constitutionality of section 107(2) in Gaylor v. Mnuchin, 919 F.3d 420, 437 (7th Cir. 2019).

[*19] home." Id. This means the exclusion does not apply to money used for food, domestic help, or expenses of a business or investment property. See sec. 1.107-1(c), Income Tax Regs.

The parties' first disagreement is whether the Browns even raised this issue for us to decide. This is important, because RA Freitas counted the Browns' alleged parsonage allowances as taxable deposits in his analyses. The Commissioner admits that he did not specifically disallow any parsonage allowance in the notice of deficiency, but argues that the Browns "failed to raise this point in their opening brief."

We disagree, and find that the Browns kept this issue alive. The Commissioner's admission that he did not subtract any parsonage allowance from gross deposits in his computation of the Browns' unreported income is an implicit assertion that, if there was any allowance, the Commissioner wants to tax it. In their petition, the Browns specifically alleged that some of the deposits were parsonage allowances. They also discussed the issue of parsonage allowances in their pretrial memorandum. And they testified about it at trial without objection.

The Commissioner points to Lunsford v. Commissioner, 117 T.C. 183, 187 (2001), and Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001), as precedent in his favor. In Lunsford, 117 T.C. at 187, the taxpayer raised only one issue and

[*20] then failed to file a posttrial brief. We could have just held that a failure to file a posttrial brief put the taxpayer in default, but we hedged a bit and bolstered our conclusion of waiver by noting that "[i]n the instant case, we think it is at least as clear that petitioners have abandoned any arguments that were not raised in their pleadings and trial memorandum." Id. In Nicklaus, 117 T.C. at 120, the taxpayers did file a posttrial brief, but said in it that they wanted to fight about one and "only" one issue. That affirmative statement was enough for us to treat the taxpayers as abandoning other issues. Id. at 120 n.4. We see no waiver of the issue as we did in Nicklaus, and the Browns did raise the issue in their pleadings and in their testimony at trial. We therefore find that their failure to argue the parsonage allowance issue in their opening brief does not mean they abandoned it.

The real problem for the Browns is not this procedural quibble, but the law's requirement that a parsonage allowance be "designated". Sec. 1.107-1(b), Income Tax Regs. This means that the allowance must be specified in amount at some point before a minister receives it--a minister can't just dip into church funds to pay his housing expenses as they arise. And a payment that isn't designated isn't excludable from income. See id.; see also Boyer v. Commissioner, 69 T.C. 521, 534 (1977). Tax law has no rubric for designating an allowance--it can be a sum of money written into an employment contract, a line item in a church's

**[*21]** budget, a notation in the minutes of the church's board, or any other document that proves official action was taken. Sec. 1.107-1(b), Income Tax Regs. It doesn't even need to be in writing. See Libman v. Commissioner, T.C. Memo. 1982-377, 44 T.C.M. (CCH) 370, 372 (1982). But to qualify as a designation, it must clearly identify the payment of a rental allowance as distinct from a salary or other compensation. Kizer v. Commissioner, T.C. Memo. 1992-584, 1992 WL 238781, at *2-*3.

That's a problem for the Browns. They introduced a log of the checks written by the CJC for their parsonage allowance in 2007, and the log shows that they received a check for $1,750 twice a month for the entire year. Accompanying the log were images of the checks, each one bearing "For: Comp and Parsonage" on its memo line. The Browns, however, did not introduce such a log for 2008 or 2009. At the beginning of 2008 there are around six checks from the CJC for $1,750 with "Comp and Parsonage" written on the memo line, but the designation of subsequent payments is unclear. There's a "parsonage" check written by the CJC at the very end of March 2008 for $8,000--an amount well beyond the typical payments--and one final check for $1,750 in April 2008. This is the last check that specifies on the memo line that it was for "parsonage". And while we have found other bimonthly checks for the Browns in their bank statements for both

[*22] years, there's nothing that would let us find it more likely than not that they were payments for a parsonage allowance.

This makes the question of whether the CJC properly designated these payments difficult and proof that the Browns actually spent the money on housing even harder to find. Reverend Brown testified that the CJC's church board approved his parsonage allowance at the start of each calendar year based on loan documentation that he provided. We could find no specific resolution that granted Reverend Brown a parsonage allowance, but at least for 2007 we find that the CJC's practice of regular payment of a regular amount, as supported by Reverend Brown's testimony, is sufficient evidence of official action and payment "distinguished from salary or other remuneration" for 2007. See sec. 1.107-1(b), Income Tax Regs. We cannot make a similar finding for 2008 and 2009, as the payments became irregular and unsupported by any check register or notation in the CJC's records.

But even given the regularity of the 2007 payments, the Browns have failed to show that they used their parsonage allowance for housing alone and that the allowance did not exceed the sum of their mortgage payments and utilities. See sec. 107(2); Rasmussen v. Commissioner, T.C. Memo. 1994-311, 1994 WL 317491, at *3-*4. Reverend Brown actually testified that the CJC pays his

**[\*23]** personal utility bills directly, leading us to wonder whether the CJC also pays the Browns' mortgage directly in addition to the $1,750 check (and increased amounts thereafter) that the Browns received twice a month. Beyond Reverend Brown's testimonial estimates of his phone and utility bills, there is nothing in the record about the Browns' actual housing expenses, and therefore we can't be sure that he and his wife weren't spending their allowance on food, vacations, or even the cash needs of his unrelated businesses. This goes for what we know were the 2007 parsonage allowance payments and what we can only guess were the 2008 and 2009 payments.

We therefore find in favor of the Commissioner on this issue and will not subtract these payments from his estimate of the Browns' taxable income as computed in the bank-deposits analyses.

### 2. Gifts From the Congregation

By far the greatest amounts of the deficiencies at stake here relate not to the parsonage allowances but to the amounts of unreported "gifts" that Reverend Brown received from members of the CJC congregation.

Let us start with the basics. Section 61(a)(1) says that gross income includes "[c]ompensation for services, including fees, commissions, fringe benefits, and similar items." See also Commissioner v. Glenshaw Glass Co., 348

[*24] U.S. 426, 431 (1955) (broadly construing gross income as "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion"). That's quite the spread, but Congress enacted section 102 to leave gifts off the table. Section 102(a) excludes from gross income "the value of property acquired by gift," but section 102(c)(1) eliminates this exclusion for "any amount transferred by or for an employer to, or for the benefit of, an employee."

What is a gift? According to the Supreme Court, "[a] gift in the statutory sense * * * proceeds from a 'detached and disinterested generosity,' * * * 'out of affection, respect, admiration, charity or like impulses.'" Commissioner v. Duberstein, 363 U.S. 278, 285 (1960) (first quoting Commissioner v. LoBue, 351 U.S. 243, 246 (1956); and then quoting Robertson v. United States, 343 U.S. 711, 714 (1952)). Recognizing that this definition may not be easy for a trial court to apply, the Court held that the most critical consideration is the transferor's intention at the time the payment was made. Id. at 285-86. But the Court warned that the transferor's characterization of his intention "is not determinative"-- instead, "there must be an objective inquiry as to whether what is called a gift amounts to it in reality." Id. at 286.

The Supreme Court's test does not draw a bright line, but caselaw helps us to apply our "experience with the mainsprings of human conduct to the totality of

[*25] the facts." Id. at 289. In a criminal case, the Fifth Circuit held that the following jury instruction accurately stated the law:

> The federal income tax is levied on income received by ministers. When an individual provides ministerial services as his trade or business, controls the money he receives in that business, and receives no separate salary, the income of that business is taxable to the minister. Voluntary contributions, when received by the minister, are income to him. Payments made to a minister as compensation for his services also constitute income to him. If money is given to a minister for religious purposes, any money used instead for the personal benefit of the minister becomes taxable income to him.

United States v. Terrell, 754 F.2d 1139, 1148-49 (5th Cir. 1985).

We recognize that Terrell was a criminal case where the minister reported no salary at all, which is not the situation here. We also recognize the difficulty in determining the intent of a great number of congregants, especially when we don't know the identities of many and were unable to hear from most of them directly. See Felton v. Commissioner, T.C. Memo. 2018-168, at *18. This forces us to focus on the objective evidence that Terrell, Felton, and other cases have found important:

- whether the donations are objectively provided in exchange for services;

- whether the cleric (or other church authorities) requested the personal donations;

**[\*26]** • whether the donations were part of a routinized, highly structured program, and given by individual church members or the congregation as a whole; and

• whether the cleric receives a separate salary from the church and the amount of that salary in comparison to the personal donations.

Felton, at \*26.

*Donations in Exchange for Services.* According to the Fifth Circuit, a contribution is a gift only if it is "not intended as a return of value or made because of any intent to repay another what is his due, but bestowed only because of *personal affection or regard or pity*, or from general motives of philanthropy or charity." Schall v. Commissioner, 174 F.2d 893, 894 (5th Cir. 1949) (emphasis added) (quoting Bass v. Hawley, 62 F.2d 721, 723 (5th Cir. 1933)) (honorarium gift because no future services promised or provided), rev'g 11 T.C. 111 (1948). Courts are unlikely, however, to find contributions to be gifts when the congregation makes such contributions in order to keep its "successful minister" at a "relatively low salary." Goodwin v. United States, 67 F.3d 149, 152 (8th Cir. 1995); see Banks v. Commissioner, T.C. Memo. 1991-641, 62 T.C.M. (CCH) 1611, 1614 (1991) (finding congregants' special donations weren't gifts since they were given out of a desire to reward the pastor for her services and a hope that she'd continue as their pastor). See generally Wallace v. Commissioner, 219 F.2d

[*27] 855, 857 (5th Cir. 1955) ("If services have been performed by the recipients, it may well be said the presumption is that the payment is for the services and not a gift").

The Browns claim that the gifts they received were not for services rendered or for future services hoped for. But we find no difference in the objective markers of the donors' intentions here from those in other cases where members of a congregation give money to their current pastor. Talisha Bennett, the CJC's bookkeeper during all the years at issue, described the church's envelope system and told us that the special gift line on the envelopes "are just if someone decides they want to just give a gift to Dr. Brown for *whatever reason*." (Emphasis added). She continued on to specify that "[s]ome people would like to give for whatever they're sowing towards," such as "for the healing of a family member" or some other special intention. The memo lines of the many, many checks in the record from congregants (all hearsay, of course, but unobjected to) include a great number of phrases such as "love seed," "first fruits," and "pastor's offering." Some are more learned, including a cite to chapter 4 of St. Paul's letter to the Philippians,[14] and obviously heartfelt--"faith walker," "thank you for everything,"

---

[14] "Not because I desire it a gift: but I desire a fruit that may abound to your account. But I have all, and abound: I am full." Phil. 4:17-18.

**[\*28]** and "the dream maker!" Above and beyond the contributions made in the form of personal checks are the CJC's checks, which aggregate the congregants' contributions.

We do not doubt that the CJC faithful made these offerings to Reverend Brown in some considerable part for the graces that they have received for their faithfulness. In tax law such "intangible religious benefits" don't count as items of value received by a donor in exchange for his donations. See sec. 170(f)(8)(B)(iii); Felton, at \*29. But in the profane world of tax law, a payment can still be for services rendered even if the payor does not receive an economic benefit from it. Duberstein, 363 U.S. at 285. As we said in Felton,

> we \* \* \* think that the exhortation by the Supreme Court in
> Duberstein to focus on objective evidence of a donor's intent means
> we have to ask whether the donations are of the magnitude and type
> that would make us doubt that what is called a gift amounts to one in
> reality.

Felton, at \*29 (citing Duberstein, 363 U.S. at 286).

Reverend Brown may not have explicitly agreed to provide future services in exchange for these contributions, but we find that they were made by congregants who meant to keep Reverend Brown preaching where he is. He provides the "fruit", or "intangible religious benefits," and the congregants' "seeds", or contributions, are in some secular sense in exchange for them.

**[*29]** This factor tilts towards income.

*Donation Requests.* A gift can be made only out of "personal affection or regard or pity, or from general motives of philanthropy or charity." Schall, 174 F.2d at 894 (quoting Hawley, 62 F.2d at 723). In Goodwin and Banks, the courts held that evidence of regular requests for donations to a pastor supports a finding that any donations made in response are income and not gifts. Goodwin, 67 F.3d at 150, 152-53 (associate pastor announced "special occasion" days where those who wished to contribute a special occasion gift to the pastor could do so); Banks, 62 T.C.M. at 1614 (the amount pledged by individual members was determined at open meetings at the church). And in Felton, at *30-*31, we reasoned that the church was not requesting donations because members had to specifically ask for a special gift envelope--an envelope that was distinct from the ones used for offerings and tithes.

Reverend Brown testified that he "do[esn't] try to manipulate anybody," or "coerce anyone" into giving a gift, and that "it's got to be solely on their heart * * * not someone sort of guiding and steering them in that direction." We completely believe this testimony, but we do find there was an expectation at the CJC that congregants should support a minister who "preach[es] it ," "teach[es] it," "believe[s] it," and "live[s] it." We also note that the CJC had at least two

[*30] major days for giving to Reverend Brown each year: the Reverend's birthday and another towards the end of November--"Bishop's Day."[15] The number of checks received on these days were a disproportionately large share of all those given to Reverend Brown each year, leading us to find that these special gift-giving days were broadcast to and well known by the congregants. That makes this case similar to Banks and Goodwin, where the courts also found that there were designated special giving days. What's more, the CJC offered only one kind of envelope for all types of contributions, and had a way for donors to specify what type of contribution they wished to make.[16] This single-envelope system, coupled with at least two main days of giving, makes us find that the CJC created an expectation to make contributions not present to the same degree in Felton.

This factor tilts towards income.

*Routinized, Highly Structured Program.* Even if congregants claim to have made contributions "out of love, admiration, and respect, not out of a sense of obligation or fear" that the pastor would leave, they are not gifts as a matter of tax

---

[15] Other spikes in giving were on Father's Day and at Christmastime.

[16] As previously discussed, the envelope allowed congregants to split their donations among four categories--"special gift," "tithe," "offering," and "building fund." We think Reverend Brown benefited by having the "special gift" designation on all envelopes. For example, someone wanting to donate $100 to the church may decide to list a portion of it for the Reverend as a special gift.

**[*31]** law if made and "gathered by congregation leaders in a routinized, highly structured program," and made on behalf of the whole congregation. Goodwin, 67 F.3d at 152 (reviewing the contributions of a congregation that had a regular procedure for making "special occasion gifts" on certain days of the year).

In slight contrast to the pattern of giving in Goodwin and Banks, the donations from congregants here were made throughout the year as well as on certain "special days" of each year. See Felton, at *31 (citing Goodwin, 67 F.3d at 150, and Banks, 62 T.C.M. (CCH) at 1612). Reverend Brown, Mrs. Brown, and Talisha Bennett all testified that congregants give gifts to the Reverend on any day and at any time--not just on Sundays during church. For example, Reverend Brown testified that congregants occasionally hand him gifts when he's "walking in the building" or just "out in a restaurant." The dates of the checks in the record do show giving throughout the year, but also show a high rate of giving on the special giving days, including Bishop's Day and the Reverend's birthday. The comparatively lower amount of and participation in year-round giving therefore does not alter our view that the CJC encouraged giving on regularly scheduled occasions.

There's other evidence that the CJC had a routinized and highly structured system. Its bookkeeping system smoothly aggregated contributions made to the

**[*32]** CJC but intended for Reverend Brown personally:  The donations were organized by form, with credit-card donations and checks written to the CJC for the Reverend pooled, totaled, and distributed to him in a single check from the CJC.  All other donations made out to him directly were bundled and passed along to him.  Donations made through the envelope system are thus objectively different and in much greater quantity than the occasional "twenty dollar gift spontaneously given by a church member."  See Goodwin, 67 F.3d at 152.

This factor tilts towards income.

*Ratio of Church Salary to Personal Donations*.  Arriving at our final factor, we have to compare, as best we can, Reverend Brown's salary from the CJC itself to the amounts of donations received from individual congregants:

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Reverend Brown's Schedule C--Minister misc. income (salary) | $105,000 | $107,750 | $120,000 |
| Mrs. Brown's CJC salary | 25,600 | 25,905 | 26,044 |
| Total reported CJC income | 130,600 | 133,655 | 146,044 |
| BDA:  Underreported CJC deposits, including parsonage payments | 154,366 | 205,523 | 118,589 |

| [*33] Contributions received on Bishop's Day and birthday | 13,650 | 26,136 | 27,390 |
|---|---|---|---|
| Possible CJC parsonage payments[1] | 42,000 | 38,000 | 32,000 |

[1] For 2008 and 2009, we let down our net into the sea of memo-less checks to fish out those that could potentially be considered parsonage payments. The totals listed for those years represent our best estimate.

The record is full of checks from congregants and the CJC giving thousands and thousands of dollars in pastoral offerings each year, not to mention the other hefty checks from the CJC for parsonage, "mortgage", "vehicle", "vacation expenses," and "medical" expenses, among other things. And this doesn't even include the thousands of dollars in cash deposits for which we cannot identify a source. We have also found multiple checks from the CJC with "DM99" in the memo--that we assume means Dream Makers 99--leaving us with the impression that the CJC was also paying some of the Reverend's motivational speaking expenses. We struggle to see how such large sums of money can be gifts, especially given our findings on the other three factors. In Felton, at *34, we found that "[w]hen comparatively so much money flows to a person from people for whom he provides services (even intangible ones), and to whom he expects to provide services in the future, we find it to be income and not gifts." It's very much the same here, and so we find that

[*34] the contributions from the CJC's congregants are taxable income to the Browns.

We can now turn to the deduction side of the case.

II.  A Taste of Buffalo and Loss Limitations

Nobody doubts that the Browns lost money on their investment in ATOB. Sections 162(a) and 212(1) generally allow taxpayers to deduct their business and investment expenses, but section 469 limits those deductions when they arise from "passive activities."  A "passive activity" is "any activity * * * which involves the conduct of any trade or business, and * * * in which the taxpayer does not materially participate."  Sec. 469(c)(1).  When a married couple goes into a business together, we look at their combined activity to decide whether it amounts to material participation.  Id. subsec. (h)(5).

But what is "material participation?"  The Code tells us that "material participation" means being "involved in the operations of the activity" on a regular, continuous, and substantial basis, id. para. (1), and the regulations lay out seven--and only seven--ways a taxpayer can prove that, see sec. 1.469-9(b)(5), Income Tax Regs.; sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-26 (Feb. 25, 1988).  The Browns claim they satisfy four of these seven ways:

**[\*35]** •    "[t]he individual participates in the activity for more than 500 hours during such year;"

 •    "[t]he activity is a significant participation activity (within the meaning of paragraph (c) of this section) for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours;"

 •    "[t]he individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;" or

 •    "[b]ased on all of the facts and circumstances (taking into account the rules in paragraph (b) of this section), the individual participates in the activity on a regular, continuous, and substantial basis during such year."

Sec. 1.469-5T(a)(1), (3), (4), (7), Temporary Income Tax Regs., supra.

The Commissioner thinks the Browns have met none of these tests. The difficulty the Browns face here is that most of these tests are quantitative--they demand proof of the number of hours that a person spends on an activity. The Browns run into their first problem with their production of two different logs for 2007: the first was provided to RA Freitas during the audit and shows that they spent a total of 502 hours participating in ATOB; the second was produced after the audit and shows 714 hours. Logs that conflict undermine each other's

[*36] credibility.  But two is better than none, and for year 2008 the Browns produced no participation logs at all.

The regulations help us gauge the credibility of the Browns' logs and any other evidence they offered to prove their material participation.  The regulations say that "[c]ontemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means."  Id. para. (f)(4), 53 Fed. Reg. 5727.  And "[r]easonable means * * * may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services * * * based on appointment books, calendars, or narrative summaries."  Id.

We've held time and time again, however, that a retrospective "ballpark guesstimate" isn't good enough, see, e.g., Moss v. Commissioner, 135 T.C. 365, 369 (2010), and "we don't have to accept unverified, undocumented testimony about how a taxpayer spent her time," Estate of Ramirez v. Commissioner, T.C. Memo. 2018-196, at *17; see also Robison v. Commissioner, T.C. Memo. 2018-88, at *26 (citing Estate of Stangeland v. Commissioner, T.C. Memo. 2010-185, Shaw v. Commissioner, T.C. Memo. 2002-35, and Scheiner v. Commissioner, T.C. Memo. 1996-554).  This is a problem for the Browns, because they offered no documentary evidence to prove their time spent on ATOB in 2008 and because

[*37] what they did offer for 2007 lacks credibility. Still, with these general thoughts in mind, let us look at each test.

A. Participation in Activity Exceeds 500 Hours

This test is easy to understand, but less easy to meet. The Browns would have to establish that together they spent more than 500 hours on ATOB. See sec. 1.469-5T(a)(1), Temporary Income Tax Regs., supra. Their best evidence for 2007 is the logs they've provided; and for 2008, all we have is testimony. In addition to their conflicting total hours, the Commissioner correctly points out that they list only the hours spent on ATOB and fail to list the services performed during those hours. Without more specifics, these logs are "ballpark guesstimates" that we won't accept.

This by itself might not be fatal if we had found the Harrises' testimony on the Browns' work hours more corroborating. When asked whether she saw the Browns again after ATOB opened its doors, Ms. Harris answered that they came in at least three times a week. Mr. Harris said that, although he did not keep track of the hours the Browns spent at ATOB, his best guess was that Reverend and Mrs. Brown spent around 30 and 20 hours a week, respectively, on ATOB for a combined total of 2,600 hours a year--an amount of time we find implausible given the Browns' full-time jobs at the CJC, and given everything else that the

[*38] Browns do.  So while we think it's clear that the Browns devoted a good amount of time to ATOB, the evidence they've provided isn't enough to satisfy this strict hours-based test.

B.   Participation Exceeds 100 Hours and Aggregate of All
     "Significant-Participation" Activities Exceeds 500 Hours

This test requires us to define a "significant participation activity."  The regulation defines it as an activity in which a taxpayer participates for more than 100 hours during the year, sec. 1.469-5T(c)(1)(i), (2), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), but does not materially participate in, id. subpara. (1)(ii).  Taxpayers therefore meet this definition if they spend just enough (over 100 hours) but not too much (less than 500 hours) time participating in an activity.  This test is a way to aggregate participation in activities that keep taxpayers busy but not too busy.

For the Browns to meet this test, they'd have to exceed 100 hours participating in ATOB and also prove that they spent over 500 hours participating in all their significant-participation activities.  See id. para. (a)(4).  Significant-participation activities do not include those that exceed 500 hours of participation, and the Browns' work at the CJC exceeds this and so is out.  This leaves us with Reverend Brown's motivational-speaking and other non-CJC activities.  We know

[*39] Reverend Brown stayed fairly busy with these, but there's nothing in the record to establish the hours that the Browns spent on each one. The Browns therefore fail this test.

### C.  Participation Exceeds 100 Hours and All Others' Participation

For the Browns to establish material participation under this test, they'd have to show that they spent more time working for ATOB than did Mr. and Mrs. Harris. See id. subpara. (3). There is no interpretation of the record that would support such a finding. The Harrises oversaw the restaurant's daily operations as their only full-time jobs. They credibly testified that they spent around 12 hours a day, 6 days a week at ATOB cooking, cleaning, hiring, and supervising staff. The Browns could hardly spend more time on ATOB if they lived there, which would be impossible given their careers at the CJC. They do not meet this test.

### D.  Regular, Continuous, and Substantial Participation

There is, however, one last test--whether, based on all the facts and circumstances, the Browns participated in ATOB on a "regular, continuous, and substantial basis" during each year at issue. See id. subpara. (7). They would still have to show participation exceeding 100 hours, id. para. (b)(2)(iii), and they can't include any "services performed in the management of" ATOB, id. subdiv. (ii). Keeping in mind that the Browns get to pool their participation, see sec. 469(h)(5),

[*40] we find based on their testimony, and that of the Harrises, that they exceed the 100-hour threshold.

We also find that, even given their occasional share of management-related participation, the Browns have met what this test requires. It is obvious to us that the Harrises managed ATOB--they ran the restaurant's day-to-day operations. See Wade v. Commissioner, T.C. Memo. 2014-169, at *7-*8 (describing management duties as running "day-to-day operations"). This means that the Browns' participation included only a *de minimis* amount of management. But the Browns focused on the important chores of handling the finances, product development, and customer retention. See Montgomery v. Commissioner, T.C. Memo. 2013-151, at *9-*11 (handling all office functions, managing payroll, preparing official documents, and attending business meetings is regular, continuous, and substantial participation).

It seems to us that the record as a whole tells a story of two couples who decided to open a restaurant, with one pair able to man the post and provide the hands-on experience, and the other able to provide the business know-how and funds. Just because the Browns weren't running the day-to-day operations doesn't mean they weren't playing a major role in ATOB's operation. They spent a lot of time working together on ATOB's menus, advertising, decor, and whatever else

[*41] needed to be done. On top of this, Reverend Brown handled most of the finances and wrote most of the checks for supplies and vendors, rent, and utilities. The Harrises gave him the daily receipts and cash, and he would do the books. He also did the payroll for ATOB. We don't believe any testimony that the Browns spent many, many hundreds or even thousands of hours doing this, but we do find it more likely than not that they spent more than 100 hours combined on these chores and were integral to ATOB's operation. This lets us find that the Browns materially participated in ATOB for both 2007 and 2008.[17]

## III. Schedule C Substantiation

The Commissioner allowed the Browns to deduct most of their claimed car expenses for each year at issue. The Commissioner says they shouldn't get anything more because they failed to meet the strict substantiation requirements of

---

[17] We also note that neither party, at any point in the proceedings, raised any problem with the Browns' deducting expenses for a restaurant that hadn't opened yet. Section 195 generally requires that a taxpayer either capitalize or amortize the start-up expenses of a business. ATOB was formed in August 2007 and didn't open its doors until March 2008, but the Commissioner did not disallow the Browns' claimed 2007 expenses on this ground. This means the Browns weren't put on notice that they might have been able to capitalize and recognize their 2007 expenses in a later year. See sec. 195(b); sec. 1.195-1(b), Income Tax Regs. We'll therefore referee the fight as the parties chose to fight it. See Mich. Mobile Home & Recreational Vehicle Inst. v. Commissioner, 66 T.C. 770, 780 n.7 (1976); see also Probandt v. Commissioner, T.C. Memo. 2016-135, at *19 n.16 (discussing prejudice to parties when issue is raised after evidentiary record is closed and requires new evidence to resolve).

**[*42]** section 274, especially in light of their honest admission that they drove the cars for both business and personal use. The Browns disagree and say that they never admitted to personal use of their vehicles, and that they would've provided the RA Freitas with mileage logs during their audit had he asked for them.

Taxpayers have the burden to establish their entitlement to deductions under section 162, and must keep good records to do so. Secs. 162(a), 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001). They must be able to prove (1) the existence of the expense, (2) that the expense was incurred during the taxable year for which it was deducted, (3) that the expense was incurred while carrying on a trade or business, and (4) that the expense was ordinary and necessary. Sec. 162(a); sec. 1.162-1(a), Income Tax Regs. The failure to maintain and produce records that support his position counts heavily against a taxpayer's attempted proof. Rogers v. Commissioner, T.C. Memo. 2014-141, at *17.

Taxpayers must comply with heightened substantiation requirements for expenses associated with the purchase and use of a car because the Code generally doesn't allow people to deduct their personal expenses, and cars are easily used for a mix of business and personal purposes. See secs. 274(d)(4), 280F(d)(4)(A)(i). These heightened requirements include proof of the amount of the expense, the time of use of the property, and the business purpose of the use.

**[\*43]** Sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). This almost always means a taxpayer has to keep an account book, diary, log, statement of expense, or other similar documentary evidence with contemporaneous entries as he makes each expenditure. See id. para. (c)(2), 50 Fed. Reg. 46017. Taxpayers also can't estimate section 274 expenses--they must prove each expense. Schladweiler v. Commissioner, T.C. Memo. 2000-351, 2000 WL 1690282, at \*2, aff'd, 28 F. App'x 602 (8th Cir. 2002).

On their Schedules C for Reverend Brown's ministry, the Browns claimed an $18,000 deduction for "[r]ent or lease" of "[v]ehicles, machinery, and equipment," for 2007; a $27,250 deduction for "[c]ar and truck expenses," for 2008; and an $18,801 deduction for "other expenses" for 2009. These claimed deductions relate only to lease payments and other car expenses.

We agree with the Commissioner's disallowance of part of these expenses. The only evidence the Browns provided us is their testimony and two Mercedes-Benz car leases, but neither is sufficient under section 274(d). The Commissioner seems to have been more lenient, because the expenses that he allowed during audit appear to have been the approximate amounts that the Browns could prove they spent on lease payments--at least for 2007 and 2008--without the additional proof that section 274 requires. Due to the Browns' failure to establish the place

**[*44]** and time, amount, and purpose of their car expenses, we disallow any additional amounts not already conceded.

IV.   Section 6662(a) Accuracy-Related Penalties

The only remaining question is whether the Browns are liable for an accuracy-related penalty for each year at issue.  The Commissioner argues that they are because their underpayments of tax were attributable to their "negligence or disregard of the rules and regulations" and also to substantial understatements of income tax.

Section 6662(a) imposes a 20% penalty when there is "[a]ny substantial understatement of income tax," id. subsec. (b)(2), which exists if the tax understatement exceeds the greater of $5,000 or "10 percent of the tax required to be show on the return," id. subsec. (d)(1)(A).  The Commissioner meets his burden of production for these penalties because the Browns' understatements for 2007, 2008, and 2009 exceed both $5,000 and 10% of the tax required to be shown on their returns.[18]

------

[18] We already granted the Commissioner's motion to reopen the record and admitted his penalty-approval form.  The Commissioner therefore meets the supervisory-approval portion of his burden of production.  See sec. 6751(b)(1); Graev v. Commissioner, 149 T.C. 485, 492-94 n.14 (2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).

**[\*45]** The burden then shifts to the Browns to try to avoid the penalties by showing that they acted with reasonable cause and in good faith. See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. They argue that they relied in good faith on their two tax preparers, Mr. Blaes and Ms. Self. To succeed in this argument, they'll have to establish that:

- their return preparers were competent professionals who had sufficient expertise to justify reliance;

- they provided necessary and accurate information to their return preparers; and

- they actually relied in good faith on their return preparers' judgment.

See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Advice from a professional must not be based on unreasonable factual or legal assumptions, and the professional may not unreasonably rely on a taxpayer's own representations, statements, findings, or agreements. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs. We'll take each preparer in turn.

*Mr. Blaes.* Mr. Blaes was the Browns' longtime tax preparer, and prepared the Browns' 2007 income and ATOB's partnership tax returns. Such a long professional relationship lets us find that the Browns had developed a high level of

[*46] trust in Mr. Blaes. But that is not the same as reasonable reliance. Mr. Blaes, while holding a degree in accounting, was not a CPA, and was not fully comfortable with the partnership return. He told them that he was pretty unfamiliar with partnership returns, having prepared only a few over the course of his career, and strongly suggested that they take ATOB's 2007 partnership return to a CPA for further review before filing. From what we can tell, the Browns chose not to do so. An additional problem is that the Browns didn't tell Mr. Blaes about the "gifts" from members of the CJC congregation. That means that Mr. Blaes did not even have a chance to give them advice on the biggest part of their contested income. As a result, we find that the Browns have failed to establish that they acted with reasonable cause and in good faith for 2007.

*Ms. Self.* The Browns' case for relying on Ms. Self's advice and preparation of their 2008 and 2009 tax returns is stronger. Ms. Self was, unlike Mr. Blaes, a CPA and attended continuing-education courses. And while she didn't have a great deal of experience with partnership returns, she neither put the Browns on notice that she wasn't fully comfortable in what she was doing nor advised them to seek further review by someone else. She must have felt confident enough with her capabilities as she filed the Browns' returns for 2008 and 2009. We think this

**[*47]** justified the Browns' confidence that Ms. Self got it right. We therefore find that Ms. Self had sufficient apparent expertise to justify reliance.

The problem is that Ms. Self testified that she was unaware of the Browns' "gifts" from congregants at the CJC. Unlike Mr. Blaes, however, Ms. Self had done some accounting for the CJC before she started to prepare the Browns' returns. The Browns knew this, and so we think it more likely than not that they reasonably believed she was aware of the CJC's contribution and collection system, and that Reverend Brown himself was collecting substantial sums in "gifts" and a purported parsonage allowance. We also believe her testimony that she would collect their tax documents and occasionally reach out to them if she thought something didn't look right. This makes it more plausible that the Browns reasonably relied on her to report their income and deductions correctly--or at least ask some followup questions if she had concerns. We don't think Reverend Brown denied her any information that she asked for, and we find nothing in his or Mrs. Brown's education or experience that would have reasonably caused them not to rely on the accuracy of her preparation of their returns. We therefore find that the Browns relied in good faith on professional advice for 2008 and 2009.

**[\*48]** This is a split result, so

Decision will be entered under

Rule 155.